UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| TODGE KEITH ELLIOTT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-cv-4027 |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

## O P I N I O N and O R D E R

Before the Court are Plaintiff's Motion for Summary Judgment (Doc. 12) and Defendant's Motion for Summary Affirmance (Doc. 15). For the reasons set forth below, Plaintiff's Motion is DENIED and Defendant's Motion is GRANTED.

### BACKGROUND

**I. Procedural History**

Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on September 8, 2004 alleging a disability onset date of September 6, 2004 (Tr. 127-9). His application was denied initially and that denial was affirmed upon reconsideration and after a hearing before an administrative law judge (ALJ) (Tr. 46-59). The Appeals Council subsequently denied review (Tr. 9) rendering the January 25, 2008 decision of the ALJ final. This lawsuit follows.

**II. Relevant Medical History**

Plaintiff's medical problems stem from an incident where Plaintiff jumped from a moving vehicle on April 25, 2003 causing a right frontal temporal parietal

subdural hematoma for which he underwent an immediate anterior temporal lobectomy with bone flap removal (Tr. 231). Immediately after the accident, Plaintiff was severely comatose, lethargic, and unable to verbalize responses (Tr. 236). Two weeks after the surgery, however, Plaintiff started rehabilitation where he was found to be alert and able to follow simple instructions (Tr. 225, 231). Two months after the accident, medical records indicate that Plaintiff showed "remarkable, rapid progress after the surgery and throughout the rehab process" (Tr. 222).  On September 19, 2003, Plaintiff underwent a second surgery, right frontoparietal craniotomy, and was discharged to his home (Tr. 199). By October 6, 2003, Plaintiff was cleared to start driving again and reported that he was ready to return to work (Tr. 283).  Dr. Todd R. Ridenour, Plaintiff's surgeon, noted that there were no restrictions at that time unless he is required to do heavy lifting or strenuous work (Tr. 283).  This conclusion was mirrored in a December 1, 2003 progress note which indicated that Plaintiff should restrict contact sports and roller-coaster rides but, other than that, is able to "be involved in most of the routine activities that a gentleman in his mid-twenties would care to be involved in" (Tr. 282).

On April 19, 2004, however, Plaintiff went to the emergency room after a "complex partial seizure with secondary generalization" and was prescribed Dilantin (Tr. 321).  Plaintiff was referred to a neurologist, Dr. Brian Anseeuw (Tr. 321). In a May 3, 2004 letter, Dr. Anseeuw noted that Plaintiff was seeing Dr. S. Govindaiah for depression and that he was taking Risperal, Adderall XR, Zoloft,

2

and Phenytoin (Tr. 317). Dr. Anseeuw concluded that Plaintiff "most likely" had a seizure given his history of a craniotomy and recent sleep deprivation (Dr. Anseeuw otherwise noted that Plaintiff was sleeping normally), continued the Dilantin prescription, and set a follow up appointment 3 months later (Tr. 319). At the July 26, 2004 follow-up, Plaintiff had no intervening seizures, was compliant with his medication, no difficulty with his medication, but did see a slight increase in his depression (Tr. 315). Dr. Anseeuw set a follow-up appointment for 6 months later (Tr. 316). On July 11, 2005, Plaintiff reported no seizures over the past year (Tr. 426). On August 1, 2006, Plaintiff again reported no seizures (Tr. 419). On August 20, 2007, however, an electroencephalogram (EEG) indicated that Plaintiff may have suffered a seizure onset but that "clinical correlation is recommended before the diagnosis of seizure is made" (Tr. 444). On November 30, 2007, Plaintiff reported no further seizures, but indicated that he was extremely fatigued (Tr. 454). At this point, Plaintiff was taking Kepra and Phentek (Dilantin) for his seizure disorder (Tr. 454-455).

As noted above, Plaintiff also began suffering from depression after his accident. On November 19, 2004, Plaintiff began treatment at the Robert Young Mental Health Center under the care of Dr. Ralph Saintfort. In setting out a history, Dr. Saintfort stated that at the time of the accident, Plaintiff suffered from a "possible psychotic break, likely drug induced" wherein he jumped from the vehicle believing that someone wanted to harm him (Tr. 333). Dr. Saintfort also noted that Plaintiff became depressed and increasingly paranoid three weeks after

3

he returned home from rehab and that he began treatment with Dr. Govindaiah in February, 2004[1] who prescribed Risperdal and Zoloft (Tr. 333). Plaintiff stopped treatment with Dr. Govindaiah in September, 2004 because he lost his health insurance (Tr. 333). Upon a mental status examination, Dr. Saintfort stated that Plaintiff had a depressed mood, a "congruent, anxious, withdrawn, and restricted" affect, but no formal thought disorder, no suicidal or paranoid ideation or delusions (Tr. 334). Dr. Saintfort diagnosed "mood or psychotic disorder secondary to general medical condition" and recommended continuation of the Risperdal (due to Plaintiff's "robust response" to this medication). Dr. Saintfort also substituted Lexapro for the Zoloft and prescribed Klonopin for the anxiety and insomnia (Tr. 335). Plaintiff also started therapy sessions.

Plaintiff followed upon January 7, 2005 (Tr. 332). He indicated that the medication was helping with his sleep and anxiety and denies any side effects (Tr. 332). However, Dr. Saintfort noted poor "sleep hygiene" wherein Plaintiff sleeps during the day until 4 p.m. and is up late at night (Tr. 332). Plaintiff's treatment plan was continued through January (Tr. 331, 401). On February 28, 2005, the Lexapro was discontinued and he was started on Lamictal (Tr. 400). On March 22, 2005, Plaintiff's treatment was continued and it was noted that he had missed three therapy sessions (Tr. 399). Plaintiff's mother, who attended the session, indicated that the Lamictal was helping and Plaintiff indicated that he was sleeping at night (Tr. 399). Dr. Saintfort noted that he was "engaging with full range of affect, more

---

[1] Dr. Saintfort states that treatment began in February, 2003. The Court assumes this is a typographical error.

optimistic and upbeat about his short-term plans" (Tr. 399). He followed up with Dr. Saintfort from May 2, 2005 to March 21, 2007 (Tr. 383-384, 388-391, 394-398).

On July 12, 2007, however, Plaintiff presented at the emergency room "in a decompensated suicidal state" because he was not given a day off work to see the doctor (Tr. 381). Dr. Eric J. Ritterhoff[2] gave an impression of "bipolar disorder mixed type posttraumatic seizure disorder and major depression" (Tr. 382). He was discharged on July 19, 2007 with reported improvement in his mood and in a non-suicidal state; however, he was diagnosed with bipolar disorder, complex partial seizures, major motor seizures in remission, and panic disorder (Tr. 380). At a follow up appointment on July 27, 2007, Plaintiff reported "daytime sedation problems" from the medication Keppra, difficulty coping with stress, no suicidal ideation, no agitation, dysphoria, or sadness (Tr. 376). Dr. Ritterhoff noted that "his mood disorder is under fair control at this time." (Tr. 376).

On September 10, 2007, Dr. Ritterhoff drafted a letter indicating that he advised Plaintiff to discontinue his employment (Tr. 436). Dr. Ritterhoff stated that:

> It is our opinion that he is not suitable for the employment that he was undertaking, that it was aggravating his overall health status to be employed in that job, that it was causing him to feel depressed and hopeless, and aggravating his preexisting bipolar disorder and depression. And, that were he to continue in that employment it would raise the risk of potential self-injurious behavior which was an associated problem leading to his hospitalization. (Tr. 436).

---

[2] Dr. Ritterhoff also is employed by Robert Young Center; Plaintiff's previous psychiatrist, Dr. Saintfort, left the clinic in April, 2007 (Tr. 383)

5

### III. Work History

Plaintiff worked as a slot attendant at a casino from February, 2002 to September, 2004 (Tr. 132). Plaintiff also was employed in 2005 and 2006, and, although the record is not clear as to his occupation, it appears that he worked at a grocery store and at a casino (Tr. 55). His past relevant work also included restaurant server, operations at an amusement park, coordinator of merchandise, assistant pressman, associate at a department store, and dishwasher (Tr. 132).

### IV. Hearing Testimony

At a hearing on November 9, 2007, before ALJ Alice Jordan, Plaintiff testified along with his mother and George Paprocki, a vocational expert. Plaintiff stated that he was 26 at the time of the hearing and that he lives with his parents who are supporting him (in addition to unemployment benefits) (Tr. 479). He stated that he stopped working at a casino in July, 2007 because he was having suicidal thoughts and his employer would not give him the day off to see his psychiatrist (as indicated above, Plaintiff spent a few days in the hospital as a result of this incident) (Tr. 485-6). Since that time, however, Plaintiff has sought other employment with no luck (Tr. 489).

Plaintiff does not believe that his medication is helping his anxiety or depression (Tr. 486-487). He indicates that he sleeps 90% of the day due to his medication, that he wake to eat, and otherwise just sits and rocks, paces, and smokes (Tr. 487). He has a hard time bathing and brushing his teeth regularly (only 2 or 3 times a week) (Tr. 488). He does, however, go to a friend's house a

6

couple of nights a week (which Plaintiff characterizes as "very rarely") (Tr. 488), drives (Tr. 491), plays cards (Tr. 490), helps with laundry when asked (Tr. 490), does housework when pushed by his parents (Tr. 491), and went camping for two days (Tr. 491). .

Plaintiff indicates that he is prevented from working because he "can't keep up," that he has a hard time remembering to do things, that he gets "overwhelmed," and that he performs tasks slowly (Tr. 492-493). When questioned by his attorney, Plaintiff further indicated that he was having seizures 3 times a day (which he originally thought were panic attacks) that would cause him to vomit (Tr. 494-495). His medications make him tired (Tr. 496) and he sleeps 19 to 20 hours a day (Tr. 498).

Plaintiff's mother testified that prior to the accident, Plaintiff was energetic and outgoing and doing well at his job at the casino (Tr. 502-503). After the accident, however, he became withdrawn, depressed, paranoid, angry, sleepy and slow (Tr. 503). She drives him to his psychiatric appointments, reminds him to take his medication, shower, dress, and eat because he has no motivation (Tr. 508).

The ALJ gave the vocational expert (VE) the following hypothetical:

> Assume a hypothetical person of the age of 26 with a high school education, with past relevant work same as the claimant's. I'm going to ask you to assume . . . no unprotected heights and no ladders, ropes, and scaffolding, nothing in that regard . . . no concentrated exposure to . . . fumes, odors, and that type, the any aggravating airborne. I do think we're going to have to go with, let's first go with unskilled and I probably will ask you to do simple and repetitive and see how many that cuts out of jobs. Let's star with unskilled jobs (Tr. 511).

7

The VE indicated that past relevant work includes a job of a change person, dishwasher, and cashier II (Tr. 511). Of these jobs, only dishwasher would be the least stressful because there is limited interaction with other people (Tr. 513). Other similar work would include assembler, of which there are about 10,000 jobs in the regional economy, and inspector, of which there are about 425 jobs in the region (Tr. 514). The VE testified that of the inspector jobs, he does not know how many are full time (Tr. 515-516). Also, a person who cannot function for a third of the day would not be employable (Tr. 516).

## V. ALJ's Decision

The ALJ determined that Plaintiff engaged in substantially gainful employment in 2006 but not in 2005 and not after January 1, 2007 (Tr. 51). The ALJ further found that Plaintiff had severe impairments subsequent to the closed head injury and including anxiety, depression, and a seizure disorder (Tr. 51-52); however, his impairments do no meet the Listings, in particular, sections 11.02, 11.03. 11.04, and 12.02 (Tr. 52). The ALJ concluded that Plaintiff can perform work that involves simple, repetitive tasks, with only limited interaction with the public, and that did not involve climbing and concentrated exposure to dust and fumes (Tr. 54).

In making this determination, the ALJ found Plaintiff's own statements of his limitation not entirely credible. The ALJ noted that his "longitudinal medical history" was inconsistent with his allegations of disability: Plaintiff recovered well from his head injury and was able to return to work fulltime (Tr. 55). While

8

Plaintiff's statement that he was unable to work at the casino and grocery store was consistent with medical evidence, the evidence did not support a finding that he was precluded from all types of word.  Plaintiff failed at his jobs because he was unable to do a wide range of procedures with the necessary speed – not because he failed to show up or needed to rest during the jobs (Tr.  55). Therefore, he is still capable of doing jobs with simple tasks and predictable routines (Tr. 55).   Plaintiff also indicates that he had seizures 3 times a day and that he sleeps 19-20 hours a day – these statements are inconsistent with 4 years of treatment notes and are "extreme exaggerations that reflect negatively on his credibility" (Tr. 56).  The ALJ noted that Plaintiff is able to maintain hygiene, do chores, visit friends, play cards, and go camping (Tr. 56).

In light of these conclusions, the ALJ indicated that Plaintiff could do his past relevant work as a dishwasher.  The ALJ went on to determine that Plaintiff could perform assembler and inspector jobs and that there were sufficient jobs in the regional economy (Tr. 58).  As such, the ALJ found Plaintiff "not-disabled."

## DISCUSSION

### I. Legal Standard

To be entitled to disability benefits under the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual

determination. *See McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made to decide whether the claimant is presently involved in a substantially gainful activity. 20 C.F.R. §§ 404.1520(a)(i), 416.920(a)(i). If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step. At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. §§ 404.1520(a)(iii), 416.920(a)(iii). If the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements on the list are met or equaled, he declares the claimant eligible for benefits. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv). If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps. At the fourth step, the claimant's RFC is evaluated to determine whether the claimant can pursue his past work. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv). If he cannot, then, at step five, the Commissioner evaluates the claimant's ability to perform other work available in the economy. 20 C.F.R. §§ 404.1520(a)(v), 416.920(a)(v).

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part, "The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Maggard*, 167 F.3d at 379 (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The claimant has the burden to prove disability through step four of the analysis, i.e., he must demonstrate an impairment that is of sufficient severity to preclude him from pursuing his past work. *McNeil*, 614 F.2d at 145. However, once the claimant shows an inability to perform his past work, the burden shifts to the Commissioner, at step five, to show the claimant is able to engage in some other type of substantial gainful employment. *Id.*

**II. Analysis**

Plaintiff first argues that the ALJ erred by failing to re-contact Dr. Ritterhoff regarding the perceived "ambiguity" with respect to the Mental Health Residual Functional Capacity (Mental RFC) form filled out by Dr. Ritterhoff on August 7, 2007. In that Mental RFC, Dr. Ritterhoff indicated "marked"[3] in the category: "Estimated degree of restriction of daily activities, i.e., ability to attend meetings (church, lodge, etc.), work around the house, socialize with friends, neighbors, etc." (Tr. 369). In other categories, Dr. Ritterhoff indicated that Plaintiff had only slight or moderate limitations (Tr. 369- 373). In her decision, the ALJ stated that "Dr. Ritterhoff's report is ambiguous with regards to whether he think the claimant

---

[3] This term is defined as "an impairment which severely affects ability to function." "Slight" is defined as "suspected impairment of slight importance which does not affect ability to function" and "moderate" is "an impairment which significantly affects, but does not preclude, ability to function." (Tr. 369).

11

could do simple unskilled work consistent with the above RFC" (Tr. 56). Plaintiff argues that if the ALJ found the Doctor's report to be ambiguous, she is obligated to contact the doctor to gain more information or to elicit an explanation. *See* 20 C.F.R. § 404.1519p(b) ("If the report is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report."); *see also* 20 C.F.R. § 404.1512(e) (regarding re-contacting a treating physician to acquire more information).

This argument is without merit. The "ambiguity" that the ALJ highlighted was not with respect to the Mental RFC that Dr. Ritterhoff performed. Rather, the ALJ was referring to the September 10, 2007 letter in which Dr. Ritterhoff indicated that Plaintiff should not be performing his past job at the casino. As indicated above, Dr. Ritterhoff's comments in the letter were limited to that particular job and the doctor did not limit Plaintiff from performing other jobs, including the unskilled, simple jobs that the ALJ found Plaintiff was still able to perform. The ALJ essentially found that expanding the letter to include all jobs was inconsistent with Dr. McCollum's report that suggested that Plaintiff could perform simple, unskilled work (Tr. 56). The ALJ's turn of phrase does not require her to follow-up with Dr. Ritterhoff and acquire elaboration or explanation because additional evidence in the record supports the conclusion that Plaintiff could perform simple, unskilled work. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir.

12

2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled.").

Plaintiff's second argument, that the ALJ impermissibly played doctor, also is related to the September 10, 2007 letter and the "marked" limitation indicated in the mental RFC. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Plaintiff argues that the ALJ erred by finding that the Plaintiff's testimony contradicted the "marked" limitation in activities of daily living, that the ALJ speculated that Dr. Ritterhoff had made this assessment after only one visit with Plaintiff, and that that ALJ failed to cite to the record to support the conclusion that Dr. Ritterhoff did not intend to limit Plaintiff from all work.

As to the last argument, a plain reading of the Dr. Ritterhoff's letter makes it clear that he was referring *only* to Plaintiff's most recent job at the casino. The letter is not as expansive as Plaintiff advocates and certainly does not include an opinion that Plaintiff is limited from performing any and all work. As such, the ALJ did not err in failing to cite to contradictory evidence. Moreover, as indicated above, the ALJ did refer to Dr. McCollum's report that suggested Plaintiff was capable of performing simple, unskilled work (a contention that Plaintiff does not dispute). It should also be noted that Dr. Ritterhoff's "discharge summary" made on July 19, 2007 tied Plaintiff's most recent hospitalization for suicidal ideation with the unsuitableness of his employment as the casino. As Dr. Ritterhoff explained: "The patient had an improvement in mood but it was felt that his personality was

13

not suitable to his current employment" (Tr. 379-380).  In addition, the ALJ found that Dr. Saintfort believed that structured daily activities "have cheered his mood and decreased feelings of hopelessness and worthlessness and he would do best if he had a job with a predictable routine" (Tr. 55). Plaintiff himself testified that he also has been seeking employment (Tr. 489).

In discounting Dr. Ritterhoff's "marked" limitation with respect to activities of daily living, the ALJ did state that "Dr. Ritterhoff's opinion that the claimant is markedly limited appears to be inconsistent with the claimant [sic] testimony regarding his typical activities of daily living and for that reason it is not give significant weight" (Tr. 56).  Plaintiff correctly points out that he testified that he needed to be "pushed" to perform housework and reminded to take showers and eat because he is unmotivated.  However, Plaintiff also testified that he was capable of driving, that he visited friends a couple of nights a week and played cards, that he went camping for two nights, that he applied for jobs in pet shops and movie theaters, and that he helps with housework when asked. This testimony appears inconsistent with a finding that Plaintiff is "severely" limited in activities of daily living. Moreover, the opinion, taken as a whole, reveals that the ALJ relied on more than just Plaintiff's testimony.  In Dr. Ritterhoff's treatment note dated July 27, 2007, he indicated that Plaintiff "is not showing remarkable regression" and that "his mood disorder is under fair control at this time" (Tr. 376).  The ALJ also credited state agency doctor's reports which indicated that Plaintiff only had, at most, moderate limitations in social interaction (Tr. 347). Plaintiff further has

14

failed to demonstrate how a single "marked" limitation on a mental RFC would render Plaintiff entitled to benefits or change the result of the ALJ's determination. As Defendant has pointed out, Plaintiff would need to show two areas of "marked" limitations to meet the Listings (Tr. 52).

Finally, the ALJ did not speculate that Dr. Ritterhoff's opinion was based on only one visit. The ALJ only stated that: "Since Dr. Rittenhoff's [sic] reports dated August 7, 2007 and September 10, 2007 appear to be based upon his contact with the claimant o July 27, 2007, it is reasonable to conclude that he did not intend to exclude the claimant from all type of work" (Tr. 56). As noted above, Dr. Ritterhoff tied Plaintiff's July, 2007 hospitalization and mental distress to his current employment at the casino. Dr. Ritterhoff's subsequent letter was limited to that particular job. The ALJ's assumption, then, that the letter was a result of the July 27, 2007 visit, is reasonable. Plaintiff does not cite to any other portion of the record that would contradict this assumption; nor does Plaintiff point to any portion of the record that would contradict the ALJ's finding that Plaintiff could perform simple, unskilled work. Indeed, Plaintiff's previous treating psychiatrist, Dr. Saintfort, makes no mention of limiting Plaintiff from working even though his work was referred to in the treatment notes. The ALJ did not play doctor but reasonably gave Dr. Ritterhoff's opinion that Plaintiff is disabled little weight in light of the other evidence in the record.

Plaintiff focuses on one portion of the medical record, Dr. Ritterhoff's September 10, 2007 letter and only one portion of the August 7, 2007 mental RFC,

15

to the exclusion of the remainder of the record which indicates that Plaintiff retains the ability to do simple, unskilled work and is therefore not disabled. The Court finds no error in the ALJ's assessment.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 12) is DENIED and Defendant's Motion for Summary Affirmance (Doc. 15) is GRANTED.

CASE TERMINATED

Entered this 8th day of April, 2010

                                                 s/ Joe B. McDade
                                                 JOE BILLY MCDADE
                                   Senior United States District Judge